Kenneth MARKWELL and William Hartz, Partners, d/b/a Markwell and Hartz, Contractors, Plaintiffs,

v.

LOCAL #978, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, AFL-CIO, and Carpenters' District Council of Greater Kansas City and Vicinity, Defendants.

No. 1713.

United States District Court
W. D. Missouri, S. D.
March 10, 1964.

Clarence Woolsey, of Allen, Woolsey & Fisher, Springfield, Mo., Wells T. Lovett, of Lovett, Howard & Moremen, Owensboro, Ky., for plaintiffs.

Gibson Langsdale, Kansas City, Mo., Harry H. Craig, St. Louis, Mo., for defendants.

JOHN W. OLIVER, District Judge.

This case, originally tried before a jury, is before this Court for a second trial; this time without a jury and on the record made at the first trial. The opinion of the Court of Appeals remanding the cause is reported as Local # 978, United Broth. of Carpenters and Joiners of America, AFL-CIO v. Markwell, 8 Cir. 1962, 305 F.2d 38. Following remand, and pursuant to procedures agreed upon at pre-trial conference, we overruled defendants' motion for summary judgment. See Markwell v. Local # 978, United Broth. of Carpenters, Etc., W.D.Mo.1963, 215 F.Supp. 792.

Thereafter, and following further pre-trial conferences, the parties agreed that this case be submitted to us without a jury on the basis of the record made at the first trial. We have studied that record, the briefs of the parties, and their respective suggested findings of fact and suggested conclusions of law. Pursuant to Rule 52 of the Rules of Civil

Procedure, we now file this memorandum opinion, and make appropriate findings of fact and conclusions of law in regard to the suggestions submitted by the parties pursuant to pre-trial order.

## I. *Memorandum Opinion*

■ We first define the method and approach that we have used as the trier of the facts. Under the agreed procedure, we must review a cold record without the benefit of seeing and hearing the witnesses. We do not consider that this fact relieves us of our primary duty to weigh the evidence. Mr. Justice Jackson pointed out in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609–610, 70 S.Ct. 854, 857, 94 L.Ed. 1097, that "Proof [of a fact] can be made in any form" and that "final determination [of an issue of fact] requires a balancing of credibility, persuasiveness and weight of evidence." It is, of course, easier to strike a balance when live witnesses are before the trier of the facts; but the absence of live witnesses does not alter our duty or the nature of the trial process.

■ As Judge Learned Hand pointed out in United States v. Aluminum Co. of America, 2d Cir. 1945, 148 F.2d 416, 433, even when "the judge has not seen the witnesses" it is nevertheless "[h]is duty * * * to sift the evidence, to put it into logical sequence and to make proper inferences from it; * * *". That, with the assistance of counsel, we have tried to do.

The point of beginning in this case is recognition that our controlling court has determined that " * * * there was substantial evidence to support a jury finding that * * * the picket line was established for the purpose of forcing plaintiffs to assign jobs to AFL-CIO members which were already filled by workers affiliated with the United Construction Workers" [l. c. 46 of 305 F.2d]. The Court of Appeals quoted portions of plaintiffs' evidence and definitely ruled that " * * * the issue of unlawful jurisdictional picketing was properly submitted to the jury, * * *." [l. c. 47 of 305 F.2d].

It is our duty, therefore, as the trier of the facts, to weigh all of the evidence and to decide whether on the basis of all of the testimony in the record plaintiffs have carried the burden of proof in regard to the issues as defined by our controlling court.

To assist us in our analysis of the record, we directed counsel for both parties to cite the particular pages of the record upon which they relied to support their suggested findings of fact. While we shall discuss the testimony in some detail later, we note at this point that on the liability issue here involved, plaintiffs have directed our attention to portions of testimony found on only 20 pages of the 340 page printed record.

The Court of Appeals' opinion either quoted extensively from or accurately paraphrases the full substance of all of plaintiffs' testimony that can be gleaned from the 20 pages upon which plaintiffs now rely on this second trial to sustain its burden of proof. In other words, if it can be said that plaintiffs have carried their burden, such a determination must necessarily rest exclusively upon the evidence fully stated and summarized in the opinion of the Court of Appeals and upon which that court determined that a jury issue was made.

■ The Court of Appeals, in accordance with established principles relating to its scope of appellate review of a jury verdict, viewed the evidence "in the light most favorable to plaintiffs" [l. c. 43 of 305 F.2d]. Our view, as the trier of the facts, must, under the law, be from an entirely different perspective. We must view and weigh the evidence and determine the facts just as though the case had never been tried.

■ We must, of course, view the evidence from our perspective, as did the Court of Appeals from its different perspective, " * * * in the light * * * [of] the legislative history of the Act, and decisional law which we consider controlling * * * " [l. c. 43 of 305 F.

2d]. We must also, as did the Court of Appeals, take into proper account "the stated purposes of the legislation" [l. c. 46 of 305 F.2d] because plaintiffs' cause of action is directly dependent upon an Act of the Congress.

■ The decision of the Court of Appeals is the most controlling of all the decisional law that we must take into account in our determination of both the facts and the law on this second trial. It is therefore noted that the Court of Appeals first determined that "It is conceded that at all times the picketing was peaceful, that it was confined to the construction site and that no neutral employers were picketed" [l. c. 42 of 305 F.2d]; that "[t]here was evidence of five different incidents at the picket line which successfully prevented plaintiffs from receiving needed services and supplies," [l. c. 43 of 305 F.2d]; but that, under the *controlling decision* of National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284 (1951), " * * * there was no evidence to support a finding that the activities and conduct of the appellants constituted secondary boycott activities and that this issue should not have been submitted to the jury" [l. c. 43 of 305 F.2d]. Apart from any question of being bound by the factual determinations just stated, our independent examination of the entire record requires that we independently make the same findings of fact quoted from the opinion of the Court of Appeals. We do so find.

■ On the law, the Court of Appeals directed particular attention to Section 13 of the Act, which it quoted in full. That Court further held that "[a] legitimate expectation of any labor organization which pickets an employer with whom it has a primary dispute is that all persons will honor the picket line, including employees of neutral employers making deliveries of supplies or performing services for the primary employer" [l. c. 43–44 of 305 F.2d]. We are bound by that law of the case.

Our controlling court also emphasized that "[t]he legislative history of § 158

(b) (4) * * * makes it compellingly clear that the evil sought to be eliminated by this legislation was not lawful primary activity, * * * *" [l. c. 44 of 305 F.2d]. Rice Milling Co. was quoted as "persuasive authority for the conclusion that defendant did not engage in secondary activities" and National Labor Relations Board v. Denver Bldg. Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), was held to be factually distinguishable from the facts of this case. [l. c. 45 of 305 F.2d].

The quotations selected by the Court of Appeals from both Supreme Court cases recognize the legality of certain primary "picketing * * * in a manner traditional in labor disputes" [l. c. 671 of 341 U.S., l. c. 964 of 71 S.Ct., 95 L.Ed. 1284; quoted on page 45 of 305 F.2d], and the legality of primary picketing that "was no more than was traditional and permissible in a primary strike" [l. c. 687 of 341 U.S., l. c. 951 of 71 S.Ct., 95 L.Ed. 1284; quoted on page 45 of 305 F.2d]. Our controlling court reiterated the approval given in Local 618, Automotive, Petroleum and Allied Industries Emp. Union, AFL-CIO v. National Labor Relations Bd., 8 Cir. 1957, 249 F.2d 332, 335, of what was said in United Electrical, Radio and Machine Workers of America, 85 N.L.R.B. 417, 418, to the effect that "[w]hen picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, an object of the picketing is to dissuade all persons from entering such premises for business reasons" [l. c. 46 of 305 F.2d]. We are also bound by those conclusions of law as stated by the Court of Appeals in its decision remanding this case for new trial.

The case was not finally disposed of on the first appeal because the Court of Appeals, after determining that there was no evidence whatsoever to support a finding of secondary activity, also held that " * * * §§ 187 and 158(b) (4) were designed to make unlawful secondary activities *and* jurisdictional strikes." It

then determined that " * * * when the object of the strike is found to be to force assignment of particular work to members of a labor organization, the situs of the picketing is not of determinative importance" [l. c. 46 of 305 F.2d]. The Court of Appeals' analysis of the evidence concluded that " * * * the issue of unlawful activity on the part of appellants by reason of picketing for the purpose of 'forcing any employer to assign particular work to employees in a particular labor organization,' was properly submitted for jury determination" [l. c. 46 of 305 F.2d].

We should notice, as part of the background, that the Court of Appeals "observed" in a footnote that a § 10(k) proceeding before the National Labor Relations Board preceded the first trial of this case (see Footnote 6 on page 42 of 305 F.2d and see also 120 N.L.R.B. 610 (1958)). We also notice in passing that the late Judge Smith issued a § 10(l) injunction before the Board rendered the decision just noted (see Sperry v. Local 978, United Brotherhood, Etc., W.D.Mo. 1957, 156 F.Supp. 187, appeal dismissed 8 Cir. 1958, 257 F.2d 813). The evidence in those cases, whatever it may have been in each separate proceeding, is not in any way before us in this trial and the inferences drawn by other tribunals from the evidence that was adduced in those different proceedings can not be considered nor can they affect our determination of this case. It should also be noted, again in passing, that the National Labor Relations Board in the § 10(k) proceeding (see United Brotherhood of Carpenters & Joiners of America, 120 N.L.R.B. 610 (1958), contrary to the latter decision of the Court of Appeals in the first appeal in this case, believed Denver Bldg. Council was applicable to and not distinguishable from the general factual situation presented to it. The National Labor Relations Board at the time of its decision in 1958 was still applying its § 10(k) rule of decision in knowing conflict with N. L. R. B. v. United Association of Journeymen, 3 Cir. 1957, 242 F.2d 722. The Supreme Court laid the Board's

§ 10(k) rule to rest in National Labor Relations Board v. Radio Engineers, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1960). In the latter case, the rule of the Third Circuit in United Association of Journeymen was expressly approved and that of the Board expressly disapproved [l. c. 578 of 364 U.S., l. c. 333-334 of 81 S.Ct., 5 L.Ed.2d 302].

■ Even when both are applying the same rules of decision it is not unusual for District Courts to disagree with the Labor Board's appraisal of whether or not the evidence in a particular case is sufficient to sustain a factual finding that recognitional or organizational picketing is a violation of the Act. In a § 10(l) proceeding, the Board must establish that the Director has "reasonable cause" to believe that the Act has been violated. The quantum of proof necessary in such a proceeding is obviously less than the quantum required to carry the burden of proof in an action for damages. The books are full of cases in which particular District Courts have determined that the inferences of allegedly illegal picketing conduct drawn by the Board cannot be and are not legally established merely by proof of the existence of a traditional primary picket line.

In Douds v. Local 50, Bakery and Confectionery Workers, Etc., S.D.N.Y.1955, 127 F.Supp. 534, for example, in a case involving post-election peaceful picketing by a defeated union, the court noted that " * * * the only effect of the pickets on [the employer] is to cause it some justifiable irritation since it could not legally recognize [the picketing union] as the bargaining representative of its employees." [l. c. p. 537 of 127 F.Supp.] Contrary to the Board's contention, that court held that " * * * such conduct, even though irritating, is not illegal" [l. c. p. 537 of 127 F.Supp.] The district court was affirmed by the Second Circuit in 224 F.2d 49 (1955).

Chief Judge Swygert, in Getreu v. Bartenders and Hotel & Restaurant Emp. Union, D.C.Ind.1960, 181 F.Supp. 738, gave full recognition to the facts of our

national economic life when, in a § 10(*l*) case, he found that the evidence, contrary to the Board's contention, failed to establish reasonable cause. For similar cases see also Brown v. Department & Specialty Store Employees Union, N.D.Cal.1960, 187 F.Supp. 619; and Penello v. Local Union No. 59, D.C.Del.1961, 195 F.Supp. 458.

Lebus v. Building and Construction Trades Council, D.C.E.D.La.1961, 199 F. Supp. 628, points up a possible explanation for the differences that are sometimes reflected by particular determinations of the Board and by the various district courts in regard to particular factual situations that involve the legal question of whether there is reasonable cause to believe that particular picketing conduct was illegal. Judge Skelly Wright there noted that " * * * prior to Landrum-Griffin the Act * * * did not expressly prohibit a union from picketing a job to compel the employer to recognize it as the bargaining agent of his employees or to compel the employees to join or select it as such bargaining agent" [1. c. 631 of 199 F.Supp.]

The Congress and the courts, as distinguished from particular decisions of the Board, have consistently and realistically recognized the basic objective of any traditional primary picket line. As Judge Wright pointed out in Lebus, the effect of Congressional inaction was as follows:

"As a result [of Congressional refusal to prohibit all recognitional picketing], unions [prior to the passage of Landrum-Griffin in 1959] which did not represent a majority of the employees in a plant were permitted freely to engage in recognitional picketing, i. e., picketing designed to force an employer to recognize or bargain with it as the representative of employees, notwithstanding the fact that the employees had never designated it to act as such, or organizational picketing, i. e., picketing to compel employees to join the union and designate it as their bargaining agent."

See also and compare Smitley and Drown v. N. L. R. B., 9 Cir., 327 F.2d 351, 1964 (not yet reported) in which it was held that "[t]he hard realities of union-employer relations are such that it is difficult, indeed almost impossible, for us to conceive of picketing * * * that did not * * * have as 'an object' obtaining a contract with the employer. This is normally the ultimate objective of any union in relation to an employer who has employees whose jobs fall within the categories of employment that are within the jurisdiction of the union * * *."

Generally, and perhaps somewhat broadly speaking, we think it can fairly be said that the particular district courts that have refused to sustain particular Board determinations of "reasonable cause" in particular cases result from an application of a particular district court's view that proof of intention can not be established on the minimal sort of evidentiary data that was seemingly convincing to the Board.

As we have indicated, our discussion of § 10(*l*) and § 10(k) proceedings in this and in other cases is an aside to point out that the earlier § 10(k) proceeding that involved the parties to this case, based as it was upon different evidence than is now before us, and also based on legal principles subsequently determined judicially to be incorrect, has no determinative effect on our appraisal of the evidence on the issues remanded for our determination by the Court of Appeals. The evidence before us must be viewed and weighed as a separate case and in light of the controlling decisional law. We look now to other legal principles that must be applied to the facts as we shall find them.

Rice Milling Co., supra, specifically relied upon and quoted from by the Court of Appeals, teaches that the mere existence of a traditional line which does in fact have the effect of stopping deliveries to the primary site of the labor dispute

does not necessarily establish a violation of § 8(b) (4). If such peaceful picketing is "directed at the * * * employees and at their employer in a manner traditional in labor disputes", the Supreme Court held in Rice Milling Co., "[c]learly, that, in itself, was not proscribed by § 8(b) (4)" [l. c. 671 of 341 U.S., l. c. 964 of 71 S.Ct., 95 L.Ed. 1284].

Local 618, Automotive, Petroleum and Allied Industries Emp. Union, AFL-CIO v. National Labor Relations Bd., 8 Cir. 1959, 249 F.2d 332, also quoted from and relied upon by the Court of Appeals, makes the same point that the mere existence of an economically effective picket line does not establish a violation of the Act. Beginning from the premise that "[o]bviously, the primary purpose of the picketing continued to be the obtaining of collective bargaining rights from the primary employer", the court recognized that under particular circumstances such picketing was completely legal [l. c. 337 of 249 F.2d]. And that case quoted with approval the principle stated in N. L. R. B. v. General Drivers, Warehousemen and Helpers, Etc., 5 Cir. 1955, 225 F.2d 205, 211, to the effect that "[w]hile * * * appropriate inferences as to the unlawfulness of objective and motive in a labor dispute" may be drawn, there nevertheless "still must be some substantial basis for inferring a wrongful rather than a legitimate motive" [l. c. 337 of 249 F.2d].

In making our ultimate factual determination we must weigh all the evidence and determine whether something more than the mere existence of a traditional picket line is proven in order to require a finding that the picket line was established for a wrongful rather than a legitimate purpose. The determination of the Court of Appeals that there was evidence in addition to the evidence of the existence of a traditiona_ picket line to support a jury finding of a violation of § 8(b) (4) (D), and that such additional evidence was sufficient to make a jury issue, does not either require or suggest that the trier of the fact on remand should or should not decide that factual question either way.

An even superficial study of the record of the first trial makes apparent that the parties, their counsel, and both the trial and appellate courts had their attention focused more on other phases of this litigation during the first trial than on the narrow factual issues presented by this second trial. Recognition of that fact and recognition of the fact that plaintiffs' principal witness is now dead merely identifies the reasons underlying why this case is in its present posture and the difficulties presented by the task of an examination of a cold record by a new trial judge. But such recognition does not lessen our obligation and duty to weigh the evidence presented to us in the form of a printed record of the first trial.

Thus far we have discussed only the legal principles stated by the Court of Appeals and by the Cases upon which that court predicated its decision. Before making an analysis of the factual data before us, we outline several other principles of law announced in decisions not mentioned by the Court of Appeals in its opinion which we considered also to be controlling decisional law. For example, Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), applying the doctrine of preemption, determined that:

"* * * the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing."

National Labor Relations Board v. Drivers Local Union, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960) places in historical perspective the various acts of the Congress that have been passed as they relate to peaceful "organizational" or "recognitional" picketing.

That case recognized that even before Norris-LaGuardia and even before the

Wagner Act was passed such picketing was legal. That case held: [l. c. 279 of 362 U.S. l. c. 709–710 of 80 S.Ct., 4 L.Ed. 2d 710]:

"Basic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection. Indeed, even before the Norris-La-Guardia Act, 47 Stat. 70, and the Wagner Act, 49 Stat. 449, this Court recognized a right in unions to 'use all lawful propaganda to enlarge their membership'. American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209 [45 S.Ct. 72, 66 L.Ed. 189]."

In noting the impact of the passage of the Taft-Hartley Act upon the then legal rights of employees and the tensions thereby created, the Supreme Court held that [l. c. 279–280 of 362 U.S., l. c. 710 of 80 S.Ct., 4 L.Ed.2d 710]:

" * * * the Taft-Hartley Act added another right of employees also guaranteed protection, namely, the right to refrain from joining a union, except as that right might be affected by an agreement authorized by § 8(a) (3). Thus tension exists between the two rights of employees protected by § 7—their right to form, join or assist labor organizations, and their right to refrain from doing so. This tension is necessarily quite real when a union employs economic weapons to organize employees who do not want to join the union."

In footnote 8 (pages 280–281 of 362 U.S., page 710 of 80 S.Ct., 4 L.Ed.2d 760) of his opinion in Drivers Local Union, Mr. Justice Brennan noted that the " * * * validity of a distinction * * between peaceful 'organizational' and 'recognitional' picketing has been challenged." He directed specific attention to the fact that when the Congress passed the Landrum-Griffin Act it did not make any distinction between "organizational" and "recognitional" picketing. The three law review articles cited in footnote 8 confirm the idea that no valid distinction exists and that efforts to make such a distinction can lead only to confusion.

The first article, written by then Professor Archibald Cox (now Solicitor General of the United States) entitled "Some Current Problems in Labor Law: An Appraisal", 35 L.R.R.M. 48, 57, objected to any "codification of the silly judicial distinction between organizational picketing and picketing for recognition," in legislation then pending before the Congress. The second article, by Bornstein, entitled "Organizational Picketing in American Law," 46 Ky.L.J. 25, noted that "during the past fifteen years, a new and highly controversial type of picketing has grown increasingly important in union organizing campaigns, so-called 'organizational picketing.' Employers detest it."

With respect to any real difference between "organizational" and "recognitional" picketing, he stated that "they differ only because the latter involves the making of an express demand for recognition and for a contract on the employer, whereas the former does not. Otherwise, their objective is the same, i. e., to persuade the employees of the picketed business to join the union." A word of caution is added to those who would substitute easy word formulae for concrete and accurate factual analysis of the economic realities of the conflicts that arise between employer and employee groups in an industrial society. He warns that:

"The aphorism that the organizational picket line coerces the employer to coerce his employees is too glib and is often factually unsound. It may be the picket line alone which can prevent an employer's using his inherent economic power to coerce his employees to refrain from having any dealings at all with the union.

"Moreover, the legal conclusion that picketing is coercive merely because a demand for recognition has

been made on the employer is equally unsound. The same courts which employ this reasoning would not enjoin the employer's signing such a contract with a union voluntarily, nor would these courts enjoin an employer's discharging employees who join or who sympathize with the union."

The third article, written by William J. Isaacson, then Chairman of the Section of Labor Relations Law of the American Bar Association, entitled: "Organizational Picketing: What is the Law—Ought the Law Be Changed?", 8 Buffalo L.R. 345, 347, observed in similar vein that "the complexity of human motivation and the difficulty of its ascertainment make it impossible to draw a line of demarcation between recognition and organizational picketing".

We believe that Drivers Local Union requires that district courts are to examine the facts of particular cases free from the cant of word formulae and in light of the Supreme Court's determination that "[i]n the sensitive area of peaceful picketing Congress has dealt explicitly with isolated evils which experience has established flow from such picketing" [l. c. 284 of 362 U.S., l. c. 712 of 80 S.Ct., 4 L.Ed.2d 710].

We must also weigh the evidence in light of the Congressional mandate that "peaceful 'recognitional' picketing" violates the Taft-Hartley Act " * * * only when it is employed to accomplish objectives specified in § 8(b) (4); * * *" [l. c. 290 of 362 U.S., l. c. 715 of 80 S.Ct., 4 L.Ed.2d 710].

With this background, we turn now to the evidence.

## II. *The Facts*

We start from the base that the Court of Appeals determined that " * * * there was substantial evidence * * * to find that the picket line was established for the purpose of forcing plaintiffs to assign jobs to AFL–CIO members which were already filled by workers affiliated with the United Construction Workers." [l. c. 46 of 305 F.2d].

While we accept our controlling court's determination that there is evidence in the record that would, on appellate review, support a factual finding to that effect, we do not believe that, as the trier of the fact, we can find that the weight and preponderance of the evidence can be said to support a finding that the object of the picket line was to force the plaintiffs to assign jobs which were already filled by United Construction Workers.

Our study of the record convinces us that the real labor dispute was a rather typical example of the inevitable conflicts that result from basic differences in employee organizational patterns in the construction industry and plaintiffs' opposition to the A. F. of L.–C.I.O. craft pattern of organization for his employees. We are further convinced that the involvement of United Construction Workers in this case was quite incidental to the real conflict and that plaintiffs pursued a course of action in regard to the U.C.W. that established a factual situation under which it can not reasonably be said that the object of the picket line was to force the plaintiffs to assign U.C.W. jobs to the picketing unions.

From the outset it is clear that Mr. Hartz knew why he wanted to bring "key men" with him into the Springfield, Missouri, area. He testified on page 98 [Record] that "these key men that we bring in * * * in our judgment, were capable of doing, besides being able to dig a ditch as a laborer, they might be able also to drive a nail as a carpenter, we felt they might be able to do different types of work * * *. They were key men to us and we worked them in various occupations and paid them accordingly." Mr. Hartz also testified that he knew that the A. F. of L. Building Trades were organized on a craft basis; that the U.C.W. was not; and that there was " * * * a lot of difference between the organizational system of the A. F. of L. Building Trades and the United Construction Workers" [R. 106]. Those facts are so well known to persons with but a passing acquaintance with employer-employee re-

lations in the construction industry that we would seriously question the credibility of any experienced general construction contractor who would attempt to testify that such facts were not a part of his working knowledge.

It is beyond dispute that the pre-job conference held at the Kentwood Arms was a pleasant meeting (R. 18, 211, 244). It is also clear that nothing came up in that meeting concerning whether plaintiffs' employees belonged either to the A. F. of L. or to the U.C.W. This vital matter simply was not discussed [R. 18, 209, 234, 248, 250, 267, 278].

We think it is obvious that had Mr. Hartz announced that he then intended to work his key men and all of his employees in a pattern inconsistent with the traditional A. F. of L. craft pattern, the meeting would not have remained pleasant very long. We believe, in fact, that had Mr. Hartz made such an announcement at the pre-job conference the row would have started then and there. And we can not help but believe that one of Mr. Hartz' experience was fully aware of that fact of labor negotiation life. Mr. Hartz testified that he did not mention the United Construction Workers at that meeting and that at that time he had no agreement, written or oral, with the U.C.W. [R. 107].

In light of the legal significance of the matter, we must note that there is surprisingly little direct evidence in the record in regard to whether any of plaintiffs' employees ever belonged to the U.C.W. Mr. Arnold was the only employee of plaintiffs who testified. He said he was a member of the local U.C.W. Union "out of Kansas City," although he could not remember the number of the local. [R. 176]. That testimony was the only direct evidence that any of plaintiffs' employees ever belonged to the U.C.W.

On the other hand, Mr. Hartz advised several union people during the course of the dispute and before the picket line was established that he did not know the affiliation of particular persons who were employed by plaintiffs. Mr. Hartz, for example, testified that he " * * * 

didn't know what his [a particular employee's] affiliations were" [R. 92]. For another example, Mr. Hartz testified that he told Mr. Pauly that he did not know whether two other employees were members of the A. F. of L. Carpenters Union, and added that "I knew that *they had been* United Construction Workers and that was about all" [R. 96]. And when he was asked whether any of his employees had ever told him whether or not they were members of the U.C.W., Mr. Hartz testified that "I think one or two of them might have said so, sir" [R. 139].

What is more important, we think are the facts concerning when the unsigned U.C.W. contract that plaintiffs obtained by telephoning the regional U.C.W. office in Kansas City was executed; and, still more important, are the undisputed facts concerning defendants' lack of knowledge concerning any execution of that unsigned U.C.W. contract.

We think these facts are of paramount importance because it is indeed difficult to see how any trier of the facts could reasonably find that an object of the picketing was to force plaintiffs to replace U.C.W. men when the weight and preponderance of the evidence in the record establishes that defendants did not know and could not reasonably have known that there were any U.C.W. men to displace.

Examining those critical facts, it is apparent that there is no dispute but that on August 22, Mr. Hartz told Mr. Pauly that he had an unsigned U.C.W. contract on his desk [R. 104, 215]. Mr. Hartz could not remember how long before August 22 that he had had the U.C.W. unsigned contract in his possession but he thought it had not been more than "several days" [R. 104]. Mr. Hartz testified that he personally had " * * * contacted U.C.W. myself and told them that we were starting the project; that they had some men here, and I didn't know whether they—the men—wanted to be represented by them or whether they wanted to represent the men, but I thought it was my duty to go ahead and

inform them of the situation, which I did * * *." [R. 105]. Mr. Hartz testified that some unidentified man came down from the U.C.W. regional office in Kansas City pursuant to the phone call he had made [R. 105].

It is perfectly clear that the U.C.W. contract had not been signed at the time Mr. Pauly made his talk to plaintiffs' employees at the job site on August 23 [R. 110]. Mr. Hartz did not know exactly when the contract was signed or who signed it first [R. 110], but he testified definitely that it was not signed at the time of the job site talks on August 23; that he did not even talk with any of the union men from the time of those talks until after the picket line was established; and that he did not "tell or send a message by any means of any kind to Mr. Pauly or any other Union representative after [he] signed this contract that [he] had signed it" [R. 111].

Mr. Pauly affirmatively testified that neither plaintiffs nor anyone representing them had ever told him that any U.C.W. "agreement had been signed at any time prior to August 26, when [he] put the picket banner up" [R. 220, See also 232]. He also testified neither he nor, to his knowledge, any other union representative ever asked Markwell and Hartz to displace any employee from a job and replace him with a member of his union [R. 237].

■ On the basis of such evidence, and weighing such evidence with that which our controlling court has held to be sufficient to make a jury issue, we can not find that the picket line was established for the purpose of forcing plaintiffs to assign jobs to the AFL–CIO members which were already filled by workers affiliated with the United Construction Workers. We do not think the weight of the evidence supports any inference that the jobs were in fact already filled by workers affiliated with the United Construction Workers.

Even, if, contrary to that finding, we should assume otherwise, we are then faced with the conviction that the weight of the evidence does not support any legitimate inference that defendants knew or could have known that particular workers employed by plaintiffs on particular construction jobs for plaintiffs were in fact affiliated with the United Construction Workers; if indeed, it is a fact that the U.C.W. contract eventually signed can be said to be a legal agreement in light of the circumstances surrounding its very existence, a matter we find unnecessary to decide.

We find the purpose of the picket line was that candidly stated by the original and present defendants. Mr. Pauly testified as follows [R. 229]:

"Q. Now, I would be justified in saying that you wanted for your men and for the other A. F. of L. crafts in Springfield, your fair share of the work out there on this project, wouldn't I? A. Surely.

"Q. You think that was what you were entitled to?

"A. That's right.

"Q. Now, I will ask you if you don't mean by 'your fair share' that you and the other crafts wanted all of the work on that project? Now, isn't that true?

"A. Yes, that is true.

\* \* \* \* \* \*

"Q. Would your Union work on that job if there were a non-union man on it? A. No.

"Q. Then you wouldn't work on that job under any circumstances unless you got every bit of the work? I believe you said that was so, didn't you? A. Within the law."

Mr. Pauly testified that he intended to use every legal means to get the work; that he had studied the Taft-Hartley Act in special union courses; and that he had so advised Mr. Hartz [R. 215–216]. Although Mr. Hartz obviously did not view Mr. Pauly's statement in the same light as did Mr. Pauly, Mr. Hartz confirmed, in substance, that Mr. Pauly had so advised him [R. 25].

Mr. Pauly testified further [R. 231]:

"Q. Then why did you put up a picket?

"A. Why did I put up a picket?

"Q. Yes.

\* \* \* \* \* \*

"A. For the purpose of organizing and letting the people of Springfield know what the situation was."

And again on page 236, Mr. Pauly testified:

"Q. Now, actually, Mr. Pauly, \* \* \* exactly what your intention was when you put that picket banner up out there \* \* \* ?

"A. The picket is for the public and people to know what the circumstances are. It is a privilege that we have had for a long time and that is the reason it was used."

And, finally, on page 238, Mr. Pauly testified:

"To me, it was an open shop job and I was making every effort to organize the job. That was the primary purpose."

The testimony as to the purpose and objectives of the picketing given by other union men no longer parties to this action is consistent with that given by Mr. Pauly [See R. 269, 276, 282, 296]. Mr. Pauly's testimony and that of the other witnesses just noted concerning the purpose and objective of the picket line reflect the obvious purpose and objective of the traditional picket line with which the Congress has long been familiar.

Each union official who was asked the question specifically denied that he had ever asked plaintiffs to displace any of their employees [Pauly, R. 237; Shipley, 276; McCarthy, 291]. Plaintiffs adduced no really substantial direct evidence to the contrary. Mr. Pauly testified that when Mr. Hartz made his job site talk to the employees "he told them that we were out there for the purpose of trying to organize" [R. 219].

 We find that the defendants' testimony as to the purpose and objectives of the picket line must be and is ac-cepted because we believe it is consistent with what likely would have been said under all the facts and circumstances of this case as we find them. We also believe and therefore find that the purpose of the picketing was traditional and organizational in nature and that plaintiff has not carried the burden of proof on the factual issue remanded for new trial.

We recognize, of course, that the Court of Appeals held that a jury would be entitled to draw other inferences and conclusions from certain evidence adduced by plaintiffs, but the determination of that question involved the application of principles relating to the scope of appellate review that are not applicable to our determination of the factual questions presented on this second trial. We shall discuss plaintiffs' evidence fully in the next section of this memorandum opinion and state our reasons for our refusal to draw the inferences and make the conclusions that the Court of Appeals held to be only permissible so far as a jury was concerned.

In order that what we have said not be read at some later date more broadly than we intend, we add that it is quite doubtful that the picketing involved in this case would be legal today because the Landrum-Griffin Act would now be applicable to such picketing. In considering what we have said here it must be remembered that the Landrum-Griffin Act was not the law of the United States when the picket line here involved was established. Had such picketing been illegal before Landrum-Griffin was passed there would have been no occasion for the passage of that new legislation that became effective in 1959. The fact that the Landrum-Griffin Act was then passed by the Congress, as its legislative history so clearly indicates, is consistent with and supports our determination that under the facts as we find them, defendants' conduct did not violate any law of the United States. Cf. and see National Labor Relations Board v. Drivers Local Union, 362 U.S. 274 (1960), at page 291, 80 S.Ct. 706, at pages 715–716, 4 L.Ed. 2d 710.

Of course, it is unnecessary to add that what picketing shall be deemed permissible and what shall not is the concern of the Congress; not the courts.

In order that the basis of our findings and conclusions of law are made completely clear, we indicate our agreement or disagreement with the specific findings of fact and conclusions of law that have been suggested by both parties.

### III. Specific Rulings on Plaintiffs' and Defendants' Suggested Findings of Fact [1]

In addition to the findings of fact and conclusions of law heretofore stated, for the purpose above stated, and for the purpose of clarity in the event of appeal, we now indicate our specific rulings on the respective suggested findings of fact submitted by the parties pursuant to our pre-trial order.

(a) Plaintiffs' requested findings 1 and 2 and defendants' requested findings 1, 2, 3, 4, and 5, all relating generally to the events that preceded the Kentwood Arms pre-job conference and how it was arranged are virtually undisputed and are therefore accepted.

(b) Plaintiffs' requested finding 3 and defendants' requested finding 6, relating to general discussions held at the Kentwood Arms meetings are also virtually undisputed and are therefore accepted.

(c) We refuse to accept plaintiffs' requested finding 4 concerning alleged assurances that Mr. Hartz did not make at the Kentwood Arms conference because we find that no one ever asked Mr. Hartz to make any assurance that "Markwell and Hartz would employ only members of the AFL on the job, or that he would require all employees to become members of the AFL, or that he would sign a contract for collective bargaining with the AFL unions."

(d) We also refuse to accept defendants' requested finding 7 in regard to a firm understanding or agreement reached

between plaintiffs and the various unions at the Kentwood Arms pre-job conference. We accept and approve the first two paragraphs of defendants' requested finding 8 which finds, in effect, that no construction workers had as yet been hired and which finds that the United Construction Workers Union was not mentioned at the meeting.

All of the participants at the Kentwood Arms meeting were experienced in the construction industry. We can not believe that the union people believed that they had a firm understanding and agreement from an employer who was obviously being very careful to keep out of any really binding commitments. We can not help but believe that the experienced union negotiators would have, or at least should have, sensed that they were dealing with a man who was holding some of his cards very close to his vest. Any idea that any "agreement or understanding" may have been reached at the Kentwood Arms meeting was promptly dispelled by plaintiffs' actions following the meeting and when the job actually started. We cannot believe that defendants were very much surprised when plaintiffs took the position that Mr. Hartz had not agreed to anything at the Kentwood Arms meeting as negotiations commenced to move from bad to worse after the job started.

(e) In regard to plaintiffs' suggested finding 5 and the remainder of defendants' suggested finding 8 (we accepted the first two paragraphs of defendants' suggested finding 8 in subparagraph (d) above), we accept the first sentence and last sentence of plaintiffs' suggested finding 5 and all the remainder of defendants' suggested finding 8 except that portion of the third paragraph that states " * * * and Mr. Pauly then agreed to admit one of the two shed builders as members of the Carpenters' Union. When Mr. Hartz contended that both men should be given union membership, Mr.

---

1. Our references will be to plaintiffs' suggestions filed January 31, 1964, which slightly modified its earlier filed suggestions. Defendants made no modifications after the oral argument held December 12, 1963.

Pauly stated that his union would only accept one because other members were then out of work. He also said that the other man would be accepted if conditions changed;" and that sentence in the fifth paragraph that states "On August 23, 1957, Mr. Hartz signed a labor agreement with a union known as the United Construction Workers."

We have studied the testimony of all witnesses as to the conversations at the shed; we have noted that Mr. Hartz told Mr. Pauly that he knew only that the two unidentified workers had at some unidentified time in the past " * * * worked in other areas for the United Construction Workers" [R. 21].

We cannot accept and expressly reject Mr. Hartz' testimony from page 21 of the record, cited by plaintiffs in support of their full suggested finding 5, which was that " * * * our agreement with the United Construction Workers required that they be paid for whatever work they were doing; if they were operating a crane, they would get the same scale wage as if they were operating a crane; if they were working as a carpenter, they would get the scale as a carpenter." We repeat that testimony because the Record shows beyond dispute that this conversation probably took place between August 20 and August 22 [R. 94, 211–214]. The important fact is that the conversation must have taken place before plaintiffs even contend they had any agreement with the U.C.W. Mr. Hartz therefore could not have been talking about any existing agreement with the U.C.W. so far as the Springfield, Missouri, job was concerned.

Plaintiffs rely only on page 21 of the record to support their full suggested finding 5. That page, and the page following it, reflect that the real dispute between the parties was over plaintiffs' insistence upon working their employees outside craft lines and, even according to plaintiffs' testimony, defendants insisted that "this was absolutely impossible so far as the A. F. of L. was concerned"; that within the A. F. of L. "certain trades, the trades had been set

up and that straight lines were followed, and the practice of one man doing another man's work, if it occurred for an hour or so here and there, it would be condoned, but it absolutely would not be considered on a long-time basis" [R. 21–22].

Mr. Hartz further testified that [R. 22]:

"Q. Did any discussion take place concerning your employees joining their union at that meeting?

"A. Well, I mentioned that Mr. Pauly agreed to take one of these people into his union; Mr. Shipley agreed to take all the people into his union.

"Q. Did any one of them request you to talk to your employees about it?

"A. *No, sir, I don't believe it came up at that time.* We told them that we would talk to our people and tell them just what Mr. Pauly said. * * * I said, all we can do was to tell our people about it and if they chose to join the A. F. of L. that was all right; *if they chose to continue as they had been working*, that was all right; that we would back them up." [Emphasis ours.]

Such talk as, the men could "choose to continue as they had been working", particularly when no mention is made of, and no protest is received from, another union supposedly in contractual relationship with the employer, is completely, if not only, consistent with the sort of talk that usually occurs in a traditional dispute over organizational efforts on a non-union job as it nears the point of the breakdown of negotiations. There is, of course, no data in this record as to what is and what is not "usual talk" at such meetings; but we do have data from plaintiffs' evidence upon which to base a finding, and we do so find, that the fact that there was not any "discussion * * * concerning your [plaintiffs'] employees joining their union at that meeting," [R. 22], and the fact that no one requested that plaintiffs "talk to

[his] employees \* \* \* at that time," [R. 22] negates any basis for any finding that anything said at that meeting by defendants can fairly be said to represent any concerted effort on defendants' part to force plaintiffs to displace U.C.W. workers with A. F. of L. members.

We also think that Mr. Hartz' testimony that he told Mr. Pauly that all that he could do "was to tell our people about [the possibility of an organizational picket line] and if they chose to join the A. F. of L. that was all right; if they choose to continue *as they had been working*, that was all right; that we would back them up" [R. 22], must be considered in light of how defendants must have understood plaintiffs' employees "had been working" at that time. Up to that point (August 15) in the negotiations plaintiffs were carefully concealing from defendants any plan they may then have had to invite the U.C.W. in the already complicated picture. At least it is clear that plaintiffs did not then threaten defendants with the unsigned U.C.W. contract. Any mention of the existence of an unsigned U.C.W. contract was not made until quite some time later than the August 15 meeting under discussion.

Mr. Hartz testified that he decided it "was his duty" to telephone the U.C.W. regional office at Kansas City "somewhere around the 19th or 20th of August" [R. 105]. We think it significant that no mention was made by plaintiffs of either the U.C.W. or of the unsigned U.C.W. contract until at least August 22, a time when both parties must have known that it was but a question of time until the picket line would be established unless one or the other backed down.

The fact that the U.C.W. and its unsigned contract had not been directly mentioned before that time (August 22) suggests that the plaintiffs' action in calling the U.C.W. into the picture was but a move on plaintiffs' part in the general economic warfare to prevent defendants from organizing the job along traditional A. F. of L. craft lines. Our study of all of the facts and circumstances re-

vealed by the evidence in this case convinces us that such was the fact, and we have so found.

Our refusal to find, as suggested by defendants that "on August 23, 1957, Mr. Hartz signed a labor agreement with a labor union known as the United Construction Workers" is based upon the fact that such a finding might indicate that this contract was in force at the time defendants spoke to plaintiffs and their employees at the job site on that date.

We think the significant fact that must not be obscured by too broad a finding is that Mr. Hartz testified on both direct and cross-examination that "at the date [August 23, 1957] of that meeting [he had *not*] signed a contract with the United Construction Workers" [R. 30] and that "when Mr. Pauly and Mr. Shipley and Mr. McCarthy were out there on the job on the 23rd of August and Mr. Pauly talked to the men at that time, [he] did *not* have this [U.C.W.] contract signed" [R. 100].

When that fact is added to the fact that Mr. Hartz did not even see "any one of those three [Pauly, Shipley and McCarthy] or any other A. F. of L. representative at any time after they left [the] job site on August 23rd, until the picket banner went on [sic] on Monday, the 26th" [R. 111], it is apparent that the weight of the evidence supports Mr. Pauly's testimony that the purpose of the picket line was not to require plaintiffs to displace any employee affiliated with the U.C.W. and replace him with an A. F. of L. member [R. 237]. We believe this must be true for the obvious reason that plaintiffs never informed defendants that plaintiffs had executed the unsigned contract that the U.C.W. regional office in Kansas City had so promptly and obligingly furnished at their telephoned request before the picket line was established by defendants. Nor is there any evidence that defendants either knew or should have known of the execution before the picket line was established.

Mr. Shipley testified that as of August 22, "I fully believed that the men were

non-union" [R. 269]. And when asked what he thought at the time of and after the meeting on job site held August 23, 1957, he testified [R. 277–278]:

"Q. Now, when the meeting was over did you have any hope in your mind that those employees would join your Union?

"A. I still felt, in my own mind, after I talked with the laborers, maybe under other conditions they would still join my Union.

"Q. You still felt that? A. I did, sir.

 \* \* \* \* \* \*

"Q. Now, when the meeting was over I will ask you if you made a statement to this effect, 'Well, I was born and raised here in Springfield, voted for these sewer bonds; it is our intent and my intent that we shall work on this project,' or words to that effect?

"A. I may have said that, yes, sir.

"Q. Now, when you used the words 'our intent' were you referring to A. F. of L.-C.I.O. Union membership in general here? A. Not necessarily, no sir.

"Q. What did you mean when you said, 'It is our intent and my intent'? What was the difference between your using the words 'my intent' and 'our intent'?

"A. Well, I hope I can make it short, but a lot of cases and a lot of times we hope with *non-union men*, still with the hope that before the job is finished they will join our Union." [Emphasis ours.]

We cite Mr. Shipley's testimony merely for the purpose of illustrating the reasonableness of the inference as to the state of mind and intent of Mr. Pauly who had the same information—or lack of information—concerning the unsigned U.C.W. contract as had Mr. Shipley. To Mr. Shipley, the job looked like a non-union job to be organized and he hoped a traditional picket line would be effective and that "before the job is finished

they [the non-union men] will join our Union." We believe and accordingly have found that Mr. Pauly must have been under substantially the same impression.

We believe defendants' denial of any intention or objective to displace U.C.W. employees is consistent with all the other facts and circumstances established by the record. Defendants' lack of knowledge concerning whether the unsigned U.C.W. contract had ever been executed, must have meant that, from their viewpoint, the whole picture looked quite like the usual resistance to be anticipated from any employer who was insisting upon employing non-union labor in a pattern inconsistent with the A. F. of L. craft organization.

(f) We reject plaintiffs' suggested finding 6. That suggested finding is to the general effect that plaintiffs took a "neutral position" with respect to the alleged Union affiliations of its employees and to the effect that Mr. Hartz told several people, including defendants, that the employees were "free to belong to either the A. F. of L. or the U.C.W." Plaintiffs suggest that such a finding is supported by pages 22 and 29 of the Record.

In the first place, the weight of the evidence does not, in our judgment, support any inference that the U.C.W. had any real position of any sort in this case until it was summoned by plaintiffs' telephone call during the last stages of the negotiations. In the second place, even if it could be assumed that the weight of the evidence could be said to support the inference that the U.C.W. did have a legitimate position, we are convinced that all of the facts and circumstances that are supported by the weight of the evidence force the inference that plaintiffs were but using the U.C.W. and the unsigned U.C.W. contract as a part of the plaintiffs' fire power in the general economic warfare between the parties. Under all the facts and circumstances, it can not reasonably be said that plaintiffs maintained a "neutral position" between the highly cooperative U.C.W. and plain-

tiffs' real adversary, the A. F. of L. unions. We so find.

We have discussed Mr. Hartz' testimony as it appears on page 22 of the Record in subparagraph (e) above. We need not repeat here what we said there.

Mr. Hartz' testimony on page 29 of the Record is part of plaintiffs' evidence that the Court of Appeals quoted on page 47 of 305 F.2d. In the part of the answer on that page of the Record that the Court of Appeals did not quote, Mr. Hartz stated that "Mr. Pauly * * * asked me, directed the question to me, as to what those various people were, as to what they did." Mr. Hartz testified that in response to Mr. Pauly's inquiry, he "commented that they did various types of work." It would seem to us that if there was a real row going on between the A. F. of L. and the U.C.W., Mr. Hartz would have said so in response to Mr. Pauly's direct question. At any rate, we have determined that the small portion of Mr. Hartz' testimony that was quoted by the Court of Appeals for the purpose of showing the nature of plaintiffs' evidence that was determined to be sufficient to make a jury issue is not consistent with the weight of the evidence as we have found the facts and that, therefore, we can not accept such testimony as support for plaintiffs' suggested finding 6.

(g) In regard to plaintiffs' suggested findings 7, 8, 9 and 10, relating to particular portions of Mr. Pauly's testimony concerning the general fact, disputed by no one, that a traditional picket line was going to be placed on the job, we reject those findings of isolated bits of testimony that tend, when considered in light of all the facts and circumstances, to do no more than conclusively establish the objective and purpose of a traditional primary picket line. We have considered all of the testimony quoted and have weighed that testimony with all of the testimony in the record in reaching our ultimate factual conclusions as to the defendants' purpose and objective as stated elsewhere herein. Accordingly,

plaintiffs' suggested findings 7, 8, 9 and 10 are expressly rejected.

(h) Because of the difficulties of establishing a particular time for the alleged execution of the unsigned U.C.W. contract, we accept plaintiffs' suggested finding 11 with the modification that the words "on August 26, 1957" shall be substituted for the words "three days after this contract."

(i) Plaintiffs' suggested finding 12, unsupported as it is by any record reference, is rejected. We can not find, for the reasons we have stated, that the weight of the evidence supports any inference that "the dispute [was] over the jobs already filled by members of the United Construction Workers.

(j) Plaintiffs' suggested finding 13 is in almost identical language as that used by the Court of Appeals on page 43 of 305 F.2d. We accept the precise language of the Court of Appeals rather than that suggested by plaintiffs as our finding because the latter language includes the undisputed fact that all deliveries in fact did eventually go through for the reason that the picket line was not maintained at night. No determinative significance may be attached to the facts as found in this paragraph because such facts only reflect the expected consequence of a traditional primary picket line.

We have definitively held that plaintiffs have not established by the weight of the evidence that defendants' picket line was illegal.

■ It must therefore follow that if a not illegal picket line produces the results of any traditional, legal picket line, those facts, standing alone, can not make defendants' legal conduct illegal. While we make plaintiffs' suggested finding 13 in the language of the Court of Appeals, we also determine as a matter of law that those isolated facts do not have any determinative impact upon the ultimate factual disposition of this case.

(k) We accept plaintiffs' requested finding 14 except that portion that states " * * * when the picketing was en-

joined by an order of the United States District Court." We have earlier discussed the reasons why neither the evidence before nor the decisions rendered by either the National Labor Relations Board or by this Court in earlier phases of litigation involving the general factual situation here involved can not have any effect upon our obligation to consider and to weigh the evidence in this entirely separate case.

(*l*) We reject plaintiffs' suggested finding 15, unsupported as it is by any reference to the record. We have found that the weight of all the relevant evidence does not support any inference that "the object of the picketing was to force Markwell and Hartz, Contractors, to assign work on the Spring Field Northwest Sewage Treatment Plant to members of the Defendant Unions rather than to union members of another labor organization, the United Construction Workers." We need not repeat here the reasons we have fully stated elsewhere.

(m) We reject plaintiffs' suggested finding 16 because the weight of the evidence does not support any finding that "prior to the time picketing commenced, the employees of Markwell and Hartz were members of a rival labor organization, the United Construction Workers, and this fact was known to Mr. Pauly."

While this matter has been fully discussed on the basis of the entire record, we shall now discuss those portions of the Record upon which plaintiffs specifically rely. Plaintiffs suggest that the testimony of Mr. Arnold as it appears on pages 172 and 173 of the Record supports their suggested finding 16. Those two pages are the only pages cited by plaintiffs. The Record shows that Mr. Arnold was then testifying about his recollection as to what Mr. Pauly said to the employees at the August 23 job site meeting. Plaintiffs' summarization of the substance of Mr. Arnold's testimony, as contained in their brief, is too broad. In fact, it is inaccurate. Mr. Arnold did not testify, as plaintiff suggests, that "Pauly told the employees at the construction site that

he understood they were *all* UCW men" (page 6 of plaintiffs' Suggested Findings of Fact, emphasis ours). The record shows that Mr. Arnold testified that:

" * * * Mr. Pauly said it was the understanding to him that we were all U.C.W. men, *part of us*, or *all of us* were U.C.W. men, and that we couldn't work as U.C.W. men in this area because there was no such Union or no wage scale for us, and he went on—let me see—he said he didn't intend for us to light here. I don't know what he meant—the U.C.W. men" (Emphasis ours) [R. 172].

Perhaps a trier of the facts could infer from Mr. Arnold's testimony that Mr. Pauly had said that "part of us *or* all of us were U.C.W." meant that it should be said that Mr. Pauly must have known that "*all* of us" were U.C.W. This trier of the fact does not draw such an inference. Apart from the obvious logical difficulties apparent from the actual, as distinguished from the summarized testimony, we find that Mr. Arnold's testimony, even in the cold record, is quite unsatisfactory in several respects.

On the question of whether the unsigned U.C.W. contract had ever been executed, Mr. Arnold testified that although he "had talked with Mr. Hartz every day" during the dispute, he did not know whether Mr. Hartz had even talked to him "about signing a contract with the United Construction Workers" [R. 177]. The frailty of Mr. Arnold's memory is also illustrated by his testimony that, although he was allegedly a union man, he could not identify nor did he "even know who the * * * job steward on the Markwell and Hartz job" was [R. 179].

While we have considered all of Mr. Arnold's testimony and have weighed it with all the other facts and circumstances concerning how Mr. Pauly could have had any real knowledge about what affiliation, if any, any of plaintiffs' employees actually had with the U.C.W. before the picketing commenced, we must reject that portion of Mr. Arnold's testi-

mony on page 172 to which plaintiffs directed our attention as affording any support for plaintiffs' suggested inference and finding.

In support of their rejected suggested finding 16, plaintiffs also directed our attention to page 173 of the record which they summarized with the statement that "employee Arnold testified that the employees were members of the United Mine Workers, of which U.C.W. was a part, when Pauly spoke to the employees" [page 6 of plaintiffs' Suggested Findings of Fact].

The record shows that Mr. Arnold actually testified on page 173 as follows:

"Q. Anything else that you recall that he [Mr. Pauly] said at that particular meeting?

"A. Mr. Hartz then told us it was strictly up to the men there; he would stand behind us one hundred percent *either way we wanted to go*, and he said that the threat even of closing down the job or anything, he would like to hope he could go ahead on the job, either way.

"Q. As a matter of fact, was Mr. Pauly's statement to you that he understood you were members of the U.C.W. Were you *or other* members members of the United Mine Workers at that time?

"A. Yes, we were." (Emphasis ours.)

Of course, if the trier of the fact viewed only the last question and answer in isolation he might be able to conclude that Mr. Arnold's answer "Yes, we were" was meant to convey the idea that Mr. Arnold thought that Mr. Pauly understood that both Mr. Arnold *and* other employees of the plaintiffs were in fact members of the U.C.W. (Of course, one would have to read the first "members" in counsel's leading question as "employees" to reach such a conclusion.)

We can not view Mr. Arnold's testimony in the light suggested by plaintiffs' counsel. We think that Mr.

Arnold's full testimony on page 173 of the record as to what Mr. Hartz was supposed to have said to the employees at the same time is generally consistent with all of the facts and circumstances as we have determined them. In the first question and answer quoted above from page 173 of the record, Mr. Arnold testified that Mr. Hartz " * * * told us that * * * he would stand behind us one hundred per cent *either way we wanted to go*" [R. 173]. We think that testimony carries with it, when considered together with all the other facts and circumstances in evidence, the legitimate inference that the unsigned U.C.W. contract had not yet been signed and that Mr. Pauly would quite naturally have assumed that plaintiffs were non-union.

What we have said here and elsewhere concerning Mr. Arnold's testimony on pages 172 and 173 of the record is not to suggest that we rely specifically upon any part of Mr. Arnold's testimony for any purpose. We have detailed Mr. Arnold's testimony as it appears on pages 172 and 173 in order to make clear the reasons why we have determined that Mr. Arnold's testimony on those two pages, the only pages to which plaintiffs have directed our attention, can not be said to support plaintiffs' suggested finding 16.

When the entire record is considered in detail we think it is apparent that the inferences plaintiffs would have us make on the basis of two pages of Mr. Arnold's testimony are quite inconsistent with the testimony of the principal actors and with the other undisputed facts and circumstances of the entire case.

We have therefore found that Mr. Arnold's testimony, if taken at its broadest, would be contrary to the weight of all the evidence. It is for these, as well as the other reasons stated elsewhere, that we reject plaintiffs' suggested finding 16.

(n) The factual determination we have made on the merits renders it unnecessary and redundant to make or to refuse to make any findings in regard to alleged damages as requested in plaintiffs' requested finding 17 and defend-

ants' requested findings 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18.

In connection with the matter of damages however, we do comment that had we been required to reach that question we would have adhered to our earlier determination that plaintiffs in any event would be entitled to recover damages only in excess of the $15,000 they have already received in settlement (see Markwell v. Local #978, United Broth. of Carpenters, Etc., W.D.Mo.1963, 215 F. Supp. 792 at 799). We also add that our review of the evidence adduced on damages is quite inconsistent with the basic rationale of the leading Eighth Circuit case of Central Coal & Coke Co. v. Hartman, 8 Cir. 1901, 111 F. 96, and with the many cases in this Circuit that follow that case. It is apparent that the elimination of substantial portions of various items of damage that rested primarily on estimates could well have reduced plaintiffs' established damage below the $15,000.00. The principle that "[l]itigants cannot be permitted to estimate the money out of the coffers of their opponents in [a] reckless way," as stated by Judge Walter Sanborn in Central Coal and Coke, is still the law of this Circuit. See Siegfried v. Kansas City Star Company, W.D.Mo.1961, 193 F.Supp. 427 at 437, affirmed 8 Cir. 1962, 298 F.2d 1, 7, certiorari denied 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785.

We have dealt with all of plaintiffs' suggested findings.

(o) Defendants' suggested finding 19 is accepted except for the last clause which reads "as plaintiffs agreed to do in the meeting which preceded the start of the construction project." Defendants' suggested findings 20, 21 and 22 are consistent with what we have found elsewhere. We therefore accept them.

#### IV. *Specific Rulings on Plaintiffs' Suggested Conclusions of Law*

In addition to the conclusions of law we have stated above, we sharpen our legal conclusions by indicating our specific action on each suggested conclusion of law submitted by the respective parties, dealing first with plaintiffs'.

(a) Plaintiffs' suggested conclusion 1, concerning jurisdiction, is accepted.

(b) Plaintiffs' suggested conclusion 2, to the effect that "the dispute was between rival groups of employees", that "no economic issues were involved", and that plaintiffs "had no quarrel with the AFL-CIO" is refused, because basically it is a request for findings of facts which we have determined adversely to plaintiffs. Defendants' accepted findings of fact 20, 21 and 22 are directly to the contrary as well as other findings of fact made by us in earlier parts of our memorandum opinion.

(c) Plaintiffs' suggested conclusion 3, to the effect that "the pressure upon the employer Markwell & Hartz to force him to assign work to members of the AFL-CIO rather than to employees belonging to the U.C.W. by picketing, gives a cause of action to Markwell and Hartz", is refused for the same reasons stated in regard to plaintiffs' suggested conclusion 2.

Plaintiffs cite only three cases in support of their suggested conclusions of law. Two of those three cases are cited in support of plaintiffs' suggested conclusion 3. The first case, International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952), is clearly distinguishable on the facts as we have found them. As stated by the Supreme Court in that case, " * * * the jurisdictional row was between the outside union and the inside union" [l. c. p. 245 of 342 U.S., l. c. p. 240 of 72 S.Ct., 96 L.Ed. 275]. On the facts as we have found them, the row could not have been between an outside union and an inside union because plaintiffs failed to prove that defendants even knew or could have known of the existence of an inside union in contractual relations with plaintiffs with which union it could have intended to get into any jurisdictional row. We have found on the facts that defendants' row was with its known opponent, the

employer, and that it is not reasonable to infer that defendants intended to direct their economic fire on an unknown opponent when its known opponent was clearly in sight. It is for these reasons that we think Juneau Spruce is distinguishable.

The second case cited to support plaintiffs' suggested conclusion 3, Wells v. International Union of Operating Engineers, W.D.Ky.1962, 206 F.Supp. 414, affirmed 6 Cir. 1962, 303 F.2d 73, is also clearly distinguishable on the facts. As stated by the Court of Appeals for the Sixth Circuit, "[t]he trial judge, in our opinion, correctly concluded that the defendants' activities were *secondary* in nature * * *" (emphasis ours, l. c. 75 of 303 F.2d). Our Court of Appeals, after its review of exactly the same evidence that we are required to weigh, definitely determined that in this case " * * * there was no evidence to support a finding that the activities and conduct of the appellants constituted *secondary* boycott activities and that this issue should not have been submitted to the jury" [emphasis ours, l. c. 43 of 305 F.2d].

Apart from any question of whether we may be bound by that determination as the law of the case, we have clearly indicated that our independent consideration of all of the evidence requires our complete concurrence with that finding. Rules of decision applicable to secondary activities are obviously not applicable to primary activity factual situations. That proposition, among others, was definitively established by the first appeal in this case. Further discussion of Wells is redundant.

(d) We refuse plaintiffs' suggested conclusion 4 as an abstract statement of law not applicable to the facts of this case.

Plaintiffs rely upon Dayton Typographical Union No. 57 v. N. L. R. B., D.C.Cir. 1963, 326 F.2d 634, to support its suggested conclusion that "picketing addressed to employees * * * is clearly distinguishable * * * from picketing which [is] purely informational in character." The cited case involved an application of the Landrum-Griffin Act in which the Congress did place additional restrictions upon recognitional, or organizational, picketing that had not theretofore existed. As we have pointed out earlier, the fact that the Congress deemed it necessary to pass such legislation is a persuasive consideration in support of the proposition that, except for such new legislation, the activities of defendants in this case were not in violation of any existing law of the United States.

(e) Plaintiffs' final suggested conclusion 5 is factual in nature and is refused for the reasons similar to our refusal to accept plaintiffs' suggested conclusions 2 and 3.

## V. *Specific Rulings on Defendants' Suggested Conclusions of Law*

The following specific conclusions of law are made in regard to the particular suggestions made by defendants. We state no conclusion of law in regard to damages, as suggested by defendants, beyond what we have stated above. As modified by us, we state the following conclusions of law specifically suggested by defendants:

(a) The object or purpose of the picketing engaged in by the defendant unions was to protest the refusal of plaintiffs to employ their members and to organize the job by use of a traditional primary picket line, particularly in regard to persons employed as carpenters.

Such an objective is not proscribed by any of the provisions of Section 303 of the Federal Act involved and in effect at the time of the picketing. Therefore, and because the defendants did not have an object or purpose then proscribed by law, their picketing cannot be construed as illegal.

(b) Because the object or purpose of the picketing involved in this case was not proscribed by law, plaintiffs' action must fail and verdict and judgment should be rendered for defendants.

Counsel for defendants shall within ten (10) days prepare an appropriate

form of verdict and an appropriate judgment entry and, after submission to counsel for plaintiffs for approval as to form, present the same to the Court for execution.

It is so ordered.