242 F.2d 722
 NATIONAL LABOR RELATIONS BOARD
v.
UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCALS 420 AND 428, AFL.
 No. 11888.
 United States Court of Appeals Third Circuit.
 Argued January 10, 1957.
 Decided March 27, 1957.
 
 Melvin Pollack, Washington, D. C. (Theophil C. Kammholz, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Arnold Ordman, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for appellant.
 Richard H. Markowitz, Philadelphia, Pa. (Louis H. Wilderman, Paula R. Markowitz, Philadelphia, Pa., on the brief), for respondents.
 Before GOODRICH, KALODNER and HASTIE, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 A controversy between two labor organizations, representing different trades, as to whether certain work should be assigned to members of the one or the other, has led to the cease and desist order of the National Labor Relations Board which this court is now asked to enforce.
 
 
 2
 Before the Board, this proceeding began with a charge of unfair labor practice filed by Riggers and Machinery Movers Local Union 161, a labor union which we shall call the Riggers, against two locals of another union, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, hereinafter called the Pipefitters. It was charged that in an effort to compel employers in the Philadelphia area to assign to the Pipefitters rather than to the Riggers the work of handling, moving and setting up equipment on which Pipefitters work, the Pipefitters had caused jurisdictional strikes in violation of Section 8(b) (4) (D) of the National Labor Relations Act, as amended.[1] Somewhat later a similar charge was filed against the Pipefitters by an employer.
 
 
 3
 Pursuant to the Riggers' charge the Board held a hearing as required by Section 10(k) of the Act.[2] At the conclusion of the hearing the Board entered an order determining that the challenged activity of the Pipefitters was unlawful (presumably in violation of Section 8(b) (4) (D)), and directing that within ten days the Pipefitters should notify the Regional Director "as to what steps the Respondents have taken to comply with the terms of this Decision and Determination of Dispute." The same procedure was followed on the employer's charge and resulted in an order essentially no different from the one entered on the Riggers' charge.
 
 
 4
 Thereafter, General Counsel for the Board, dissatisfied with the Pipefitters' reaction to the Board's Section 10(k) determination, issued a complaint comprehending the subject matter of the Riggers' charge and the employer's charge and seeking a cease and desist order against coercive activity by the Pipefitters to obtain the work in dispute. That proceeding resulted in the requested order and we are now asked to enforce it.
 
 
 5
 In challenging this order the Pipefitters raise an important question concerning the Board's statutory duty in dealing with jurisdictional disputes. This is the problem. Section 8(b) (4) (D) and Section 10(k), which the Taft-Hartley Act added to the statutory scheme of the Wagner Act, define a new type of unfair labor practice and establish a special procedure for redress. Normally, a complaint of unfair labor practice leads directly to an invocation of the Board's authority under Section 10(c) to issue an administrative cease and desist order. But, under the new special scheme for dealing with certain jurisdictional strikes as unfair labor practices, the Board is authorized to act under Section 10(c) only after it has made, and failed to obtain compliance with, a determination of special type as provided in Section 10(k). The Board recognizes this requirement of sequential steps. See e. g. Juneau Spruce Corporation, 1949, 82 N.L.R.B. 650, 655-656. It is argued against enforcement of the Section 10(c) order here that what the Board issued as a prerequisite Section 10(k) order is not such a determination of the dispute as Section 10(k) requires.
 
 
 6
 What Section 10(k) says is that "the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen." What the Board did here in attempted compliance with that directive was to make a decision stating merely that the coercive action of the Pipefitters in an effort to compel assignment of the work in question to them was illegal. But at the same time the Board did not determine, and affirmatively disavowed any intention to determine, whether, all relevant circumstances considered, the task of moving and setting up equipment for the use of pipefitters should be viewed as lying within the work area of pipefitters or riggers.
 
 
 7
 We think the Board has not done what Section 10(k) requires of it. In approaching this problem we have asked ourselves what, within the meaning of Section 10(k), is "the dispute out of which such unfair labor practice shall have arisen" which the Board is "directed to hear and determine". To us it seems clear that the jurisdictional dispute between the two unions is the dispute which Section 10(k) requires the Board to "hear and determine". We think this is the only sensible reading of the simple and unambiguous language which Congress employed.[3] Moreover, the legislative history of the jurisdictional dispute provisions of the Taft-Hartley Act strongly supports this view.
 
 
 8
 Throughout the legislative discussion of this proposed new feature of the National Labor Relations Act it was repeatedly said that the design was an expeditious settlement of jurisdictional disputes. The bill, which was to become the Taft-Hartley Act, passed the House of Representatives without this feature. The issue first arose in the Senate when Senator Morse proposed a scheme to settle industry disrupting jurisdictional disputes either by direct Board adjudication or by compulsory arbitration through a Board-appointed arbitrator. 93 Cong.Rec. 1846, 1847, 2 Legislative History of the Labor Management Relations Act, 1947, 985, 987. All discussion thereafter on the floor and in committee reports addressed itself to the scheme as one for the actual settlement of jurisdictional disputes. See S. Rep.No. 105, 80th Cong., 1st Sess. (1947), 1 Legislative History of the Labor Management Relations Act, 1947, 414, 433; S.Rep.No. 105 (Minority), 80th Cong., 1st Sess. (1947), 1 Legislative History of the Labor Management Relations Act, 1947, 480; 93 Cong. Rec. 4035, 2 Legislative History of the Labor Management Relations Act, 1947, 1046 (Senator Murray); 93 Cong.Rec. 4138, 2 Legislative History of the Labor Management Relations Act, 1947, 1068 (Senator Ellender).
 
 
 9
 The conference committee of the two houses omitted the Senate approved alternative procedure of appointing an arbitrator and agreed upon Section 10(k) in its present form providing only for adjudication by the Board itself. The conference report stated plainly that Section 10(k) "would empower and direct the Board to hear and determine disputes between unions giving rise to unfair labor practices under Section 8(b) (4) (D)." H.R.Conference Rep.No. 510, 80th Cong., 1st Sess. (1947), 1 Legislative History of the Labor Management Relations Act, 1947, 561. When this conference report came to the floor, Senator Morse, the author of the original scheme, objected that the amended version would compel the Board itself in in every case to determine "the proper work task allocations as between unions involved in jurisdictional strikes" rather than permitting the Board to delegate the function to arbitrators who could more effectively utilize the fact finding process of arbitration and its economic approach. 93 Cong.Rec. 6452, 2 Legislative History of the Labor Management Relations Act, 1947, 1554. Senator Murray, emphasizing the advantages of arbitrators, specially skilled and familiar with the peculiarities of individual industries, stated a similar view of the Board's responsibility under the conference text. 93 Cong.Rec. 6506, 2 Legislative History of the Labor Management Relations Act, 1947, 1585. Cf. the discussions of legislative history in Juneau Spruce Corporation, 1949, 82 N.L.R.B. 650, 656 n. 6; Herzog v. Parsons, 1950, 86 U.S.App.D.C. 198, 181 F.2d 781, 786. No one suggested that this was a mistaken view or an overstatement of the Board's responsibility under Section 10 (k). Finally, it is noteworthy that Congress enacted this legislation over a Presidential veto which pointed out, among other things, that the provisions now under discussion seemed undesirable because they would induce unions to engage in jurisdictional strikes in order to require the Board to determine the underlying jurisdictional disputes. 93 Cong.Rec. 7486, 1 Legislative History of the Labor Management Relations Act, 1947, 916.
 
 
 10
 On the other hand, we have found nothing in the legislative history which in any way suggests a narrower or different responsibility of the Board in a Section 10(k) proceeding.
 
 
 11
 It is also significant that to regulate the administration of Section 10(k) the Board itself has adopted a rule recognizing that this section empowers it to adjudicate the merits of jurisdictional disputes. The rule reads as follows:
 
 
 12
 "Section 102.73. Upon the close of the [Section 10(k)] hearings the Board shall proceed * * * to certify the labor organization or the particular trade, craft, or class of employees, as the case may be, which shall perform the particular work tasks in issue, or to make other disposition of the matter * * *." 29 C.F.R. § 102.73 (Supp.1956).
 
 
 13
 And once it is recognized that Section 10(k) authorizes a ruling on the merits of the basic jurisdictional dispute, we think it necessarily follows that such a ruling is obligatory. For the section is phrased as a mandate under which the Board's duty is coextensive with its authority.
 
 
 14
 We think too that the inclusion of a Section 10(k) proceeding as a required step in the administrative disposition of such cases as this would be rather pointless if the Board were authorized to make so limited a determination as has been made here. See the dissents of Members Murdock and Houston in Moore Drydock Company, 1949, 81 N.L.R.B. 650 and Juneau Spruce Corporation, 1949, 82 N.L.R.B. 650. The Board has determined that the coercive activities of the Pipefitters were unlawful, and nothing more than that. Yet, it is necessary to follow up that determination with another hearing and determination of essentially the same thing to afford a basis for a cease and desist order. And then the Board must obtain a court order to enforce its mandate. We do not believe that Congress intended to require judicial enforcement to be preceded by successive administrative determinations of the existence of a particular unfair labor practice. The preliminary Section 10(k) determination must have some different function. The scheme makes sense only if the first hearing under Section 10(k) is concerned with an arbitration type settlement of the underlying jurisdictional dispute, so that a subsequent Section 10(c) unfair labor practice adjudication becomes necessary only if a union shall fail to respect the jurisdictional boundary which the Board has delineated.
 
 
 15
 We realize that this conclusion requires administrative action which the Board, after careful consideration, has repeatedly avoided. Moore Drydock Company, supra; Juneau Spruce Corporation, supra; United Brotherhood of Carpenters and Joiners, 1950, 88 N.L. R.B. 844; Los Angeles Building and Construction Trades Council, 1949, 83 N.L.R.B. 477. One stated reason has been the Board's concern lest it accord a labor organization more than the limited union shop provided in Section 8(a) (3) of the Act. Thus, in Los Angeles Building and Construction Trades Council, supra at 482, the Board said:
 
 
 16
 "We are not by this action to be regarded as `assigning' the work in question to the Machinists. Because an affirmative award to either labor organization would be tantamount to allowing that organization to require Westinghouse to employ only its members and therefore to violate Section 8(a) (3) of the Act, we believe we can make no such award."
 
 
 17
 But cf. Winslow Brothers and Smith, 1950, 90 N.L.R.B. 1399; Safeway Stores Inc., 1952, 101 N.L.R.B. 181. This argument seems to presuppose that a Board determination of the merits of a jurisdictional dispute would be binding on employers as an adjudication of bargaining representative. Without deciding this question, we point out that the Act does not say so. Moreover, we do not believe that the plain requirement of Section 10(k) should be disregarded even though another provision of the statute may make it seem anomalous.
 
 
 18
 Whether the Board has also been impressed by the practical difficulties and policy considerations raised by Congressional and Executive criticism of Section 10(k) as finally enacted, we do not know. But in any event, we think Congress itself saw fit to disregard those considerations and to enact a provision which is inflexible, leaving no room for discretion or expert judgment of the Board whether it should or should not make a determination of the underlying jurisdictional dispute in a Section 10(k) proceeding.
 
 
 19
 Finally, we note that in decisions soon after the enactment of the Taft-Hartley Act the Members of the Board disagreed upon the line to be drawn between jurisdictional disputes which are the subject of Section 8(b) (4) (D) and controversies over representation which may not be comprehended by that subsection. See e. g. Moore Drydock Company, 1949, 81 N.L.R.B. 650; Juneau Spruce Corporation, 1949, 82 N.L.R.B. 650. There was also disagreement in these cases whether Section 8(b) (4) (D) and Section 10(k) are coextensive. Apparently, the courts have not had occasion to pass upon these questions and they do not arise in the circumstances of the present case. However, it is possible that our decision in this case may make these dormant issues sufficiently important to call for their re-examination in proper cases. But awareness that such difficulties and complications may be engendered provides no escape from what to us seems a necessary construction of Section 10(k).
 
 
 20
 It is our conclusion that, in the circumstances of this case, the Board did not make such a Section 10(k) determination as the statutory scheme requires before proceeding with the Section 10(c) adjudication which we are asked to enforce.
 
 
 21
 Accordingly, the petition for enforcement of the Board's order will be denied.
 
 
 
 Notes:
 
 
 [1]
 Section 8 (b) (4) (D) reads:
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise to handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: * * * (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:" 61 Stat. 141-142 (1947), 29 U.S.C.A. § 158(b) (4) (D) (1952).
 
 
 [2]
 Section 10(k) reads:
 "(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8 (b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed." 61 Stat. 149 (1947), 29 U.S.C.A. § 160(k).
 
 
 [3]
 Discursive commentary on Section 10(k) in such terms appears even in this case. In the Intermediate Report, which the Board approved, it is said that "Section 10(k) provides for an administrative hearing and determination by the Board on the issue of legal entitlement to the work assignments involved in the underlying dispute out of which the charged unfair labor practice arose * * *." But later, apparently without awareness of a change of position, reference is made to "* * * a determination such as that here, where the underlying dispute has not actually been resolved by the Board and remains unsettled * * *."