410 F.2d 5
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL NO. 825, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, Respondent,
Burns and Roe, Inc., and White Construction Company, Intervenors.
 No. 17180.
 United States Court of Appeals Third Circuit.
 Argued December 5, 1968.
 Decided April 25, 1969.
 
 COPYRIGHT MATERIAL OMITTED Fred R. Kimmel, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Daniel H. Jacoby, Attys., N. L. R. B., on the brief), for petitioner.
 Earl S. Aronson, Newark, N. J. (Thomas E. Durkin, Jr., Newark, N. J., on the brief), for respondent.
 Vincent J. Apruzzese, Apruzzese & McDermott, Newark, N. J., for intervenors.
 Before HASTIE, Chief Judge, and KALODNER, Circuit Judge.
 OPINION OF THE COURT
 HASTIE, Chief Judge.
 
 
 1
 This case is before us on a petition of the National Labor Relations Board for enforcement of a cease and desist order based upon the Board's finding that the respondent, Local 825, International Union of Operating Engineers, violated section 8(b) (4) (D) of the National Labor Relations Act, 29 U.S.C. § 158(b) (4) (D), by coercing White Construction Co., an employer, with the object of compelling White to assign the starting and stopping of an electric welding machine to operating engineers represented by Local 825 rather than to the ironworkers who used the machine and were represented by Ironworkers Local 350. The Board also found that in connection with the same controversy Local 825 had violated section 8(b) (4) (B) of the Act by conduct in the nature of a secondary boycott against other employers in an effort to compel them to cease doing business with White. This conduct also was interdicted by the cease and desist order.
 
 
 2
 The Board's factual findings relevant to the alleged section 8(b) (4) (D) violation are adequately supported by the record. It appears that White undertook as a subcontractor to construct the reactor building for a projected nuclear power plant. In the course of the job White assigned to its ironworker employees the work of starting and stopping an electric welding machine that they used in welding structural steel. At that time White had no contract with Local 825 though White's work force included two members of that union, an engineer and an oiler who operated a crane.
 
 
 3
 At this juncture a representative of Local 825 demanded that White employ a member of that Union to push the buttons that started and stopped the welding machine. When White failed to comply and to sign an agreement giving Local 825 jurisdiction that would include electric welding machines, the crane engineer and oiler stopped work for one day. More prolonged work stoppages by the engineers occurred during the ensuing weeks. The Board found the union responsible for these work stoppages and the record fully supports that conclusion.
 
 
 4
 Both Local 825 and the Ironworkers' Union were obligated by contract with the Building Trades Employers' Association to recognize the jurisdiction of the National Joint Board for the Settlement of Jurisdictional Disputes and "to be bound by all decisions and awards" made by that body in exercise of its agreed jurisdiction. Accordingly, the matter of the work claimed by Local 825 in connection with the use of electric welding equipment was referred to the Joint Board. That Board issued an award confirming White's assignment of the work in question to the ironworkers.
 
 
 5
 Although in its answer to the complaint in this case Local 825 admitted that it was bound, as its contract with the Employers' Association provided, by the award of the Joint Board, it refused to respect the award when it was made. Rather, it persisted in its demand that the disputed work be assigned to operating engineers and in its coercive tactics to enforce that demand. This unfair labor practice proceeding followed.
 
 
 6
 The union asserts two principal defenses; first, that there was no such claim by the ironworkers to the work in question as would create a jurisdictional dispute; and second, that the present unfair labor practice decision is invalid because it was not preceded by and grounded upon a Board award of the claimed work to a particular craft in a section 10(k) proceeding, 29 U.S.C. § 160(k).
 
 
 7
 The contention that there were no conflicting claims creating a jurisdictional dispute is without merit. The employer's original assignment of ironworkers to start and stop the electric welding machines they were to use may well have been made routinely without any demand by those employees or their union. However, they did accept this work as an incident of their job. This entire dispute grows out of that work assignment and its acceptance.
 
 
 8
 More important, the Ironworkers Union and the Union of Operating Engineers were opposing parties in the ensuing proceeding before the Joint Board to determine which craft should perform the work in question. The Ironworkers prevailed, thereby establishing their right to the work under the procedure agreed to by all of the parties. Thereafter, ironworkers performed the work as a matter of established right. And they have not disclaimed that right. In these circumstances, it is specious to argue that the persisting demand of the operating engineers that the work be assigned to them does not create a jurisdictional dispute. Cf. N. L. R. B. v. Local 1291, International Longshoremen's Ass'n, 3d Cir. 1966, 368 F.2d 107; N. L. R. B. v. Local 25, International Brotherhood of Electrical Workers, 2d Cir. 1967, 383 F.2d 449. "The fact that one union has the jobs and holds on to them in a polite, non-belligerent manner while the other union uses the forbidden tactics in an effort to get them, or some of them, does not mean that what Congress regarded as the evils of a jurisdictional dispute are not present." International Brotherhood of Carpenters v. C. J. Montag & Sons, Inc., 9th Cir. 1964, 335 F.2d 216, 221.
 
 
 9
 The respondent's second contention is that this unfair labor practice proceeding is premature because the Board did not first utilize a proceeding under section 10(k) of the Act to make a decisive award of the work to one craft or the other.[1]
 
 
 10
 In most cases a Board award under section 10(k) and a refusal to abide by that award must precede an unfair labor practice proceeding based on a jurisdictional dispute. N. L. R. B. v. Radio and Television Broadcast Engineers, Local 1212 (C.B.S.), 1961, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302; N. L. R. B. v. United Ass'n of Journeymen, 3d Cir. 1957, 242 F.2d 722. However, we agree with the Board that in the circumstances of this case a section 10(k) proceeding was not necessary. That section reads as follows:
 
 
 11
 "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of Section 8(b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."
 
 
 12
 It will be observed that the statute expressly provides for the discontinuance of a section 10(k) proceeding where the parties show that they have "agreed upon methods for the voluntary adjustment of the dispute". The present parties had agreed in advance upon a method of voluntary adjustment and did in fact utilize that method in this case. We cannot believe that Congress intended to require a section 10(k) proceeding after a binding voluntary settlement of a dispute when the legislative scheme provides for the discontinuance of a section 10(k) proceeding if such an adjustment shall occur during its pendency. Wood, Wire and Metal Lathers Union (Acoustical Contractors), 1958, 119 N.L.R.B. 1345, cited with approval, Carey v. Westinghouse Electric Corp., 1964, 375 U.S. 261, 264 n. 4, 84 S.Ct. 401, 11 L.Ed.2d 320. Indeed, in the present circumstances a section 10(k) proceeding would be a pointless formality. For having agreed to the settlement of jurisdictional disputes by the Joint Board and having experienced an adverse ruling in this case, Local 825 is in no position to challenge the merits of that ruling before another tribunal. Cf. Electrical Workers Local 26 (McCloskey & Co.), 1964, 147 N.L.R.B. 1498.[2]
 
 
 13
 Accordingly, we conclude that a violation of section 8(b) (4) (D) has been properly established.
 
 
 14
 Different issues arise under the charge of secondary boycott in violation of section 8(b) (4) (B). This charge involves contractors additional to White. Burns & Roe, Inc., was the general contractor for the entire nuclear power plant project. It subcontracted all of the construction work and thus had no construction employees. Chicago Bridge & Iron Co. and Poirier & McLane Corp., as well as White, were subcontractors working at the project site. The Board's conclusion that section 8(b) (4) (B) had been violated was based on findings that the respondent had coerced Burns and its subcontractors other than White in an effort to force Burns to "cease doing business" with White.
 
 
 15
 The record amply justifies the conclusion that these contractors were subjected to coercion in the form of threats or walkouts, or both. The debatable issue is whether the object of this coercion was to force Burns to "cease doing business" with White within the meaning of section 8(b) (4) (B).
 
 
 16
 It was not the Board's theory, nor does it seem seriously to be contended that the respondent sought to compel Burns to stop using the services of White or to terminate its contract with White. Indeed, such action would not have been advantageous to the respondent. Rather, it is said that the respondent undertook to "disrupt the business relation" between Burns and White so that the contractor would try to induce the subcontractor to comply with the respondent's demands. The question is whether conduct so intended seeks to compel the one contractor to "cease doing business" with the other within the meaning of section 8(b) (4) (B).
 
 
 17
 We considered a similar situation in N. L. R. B. v. Local 825, International Union of Operating Engineers, 3d Cir. 1964, 326 F.2d 218, and concluded that the finding of a "cease doing business" objective was not warranted. It is now urged that this case is distinguishable from that one because in the earlier case the work stoppages, though to the neutral employer's detriment, were not attended by any communication of the union with that employer. However, the disruption of the neutral employer's business activity in connection with the primary employer and the objective of exerting pressure upon the primary employer through the neutral one was essentially the same there as here. Indeed, we quoted but did not approve the Board's finding:
 
 
 18
 `"* * * Even, assuming, arguendo, that Respondent merely intended by its strike to force Selby and Elmhurst to require Nichols to change its method of operation, this in itself would have disrupted or seriously curtailed the existing business relationship between Nichols and these two other contractors, which would have been tantamount to causing the latter employers to cease doing business with Nichols."' 326 F.2d at 220.
 
 
 19
 Moreover, in neither case did the union admit a "cease doing business" objective but rather in both cases the circumstances compelled the inference that the union wanted the contractor to use its influence with the subcontractor to change the subcontractor's conduct, not to terminate their relationship.
 
 
 20
 Accordingly, following our earlier decision, we hold that proof of coercive activity amounting to "disruption of a business relationship" and aimed at causing a neutral employer to put pressure on the primary employer is insufficient, without more, to establish an effort to compel the one employer to "cease doing business" with the other. The language of section 8(b) (4) (B) is apt to prohibit the classical secondary boycott where the attempt is made to coerce the primary employer by compelling others to stop trading or otherwise dealing with him. But we think the "cease doing business" language is not apt to cover the objective proved here, however objectionable or deserving of condemnation it may be. But cf. N. L. R. B. v. Carpenters District Council of New Orleans and Vicinity, AFL-CIO, 5th Cir., 407 F.2d 804, decided February 19, 1969. We think it is for Congress to broaden the language of section 8(b) (4) (B) if it desires to cover such situations as this.
 
 
 21
 Finally, we consider objections of the respondent to the breadth of the Board's cease and desist order.
 
 
 22
 Paragraph 1(a) of the order restrains violations of section 8(b) (4) (B). That subparagraph will not be enforced because no violation of section 8(b) (4) (B) has been established.
 
 
 23
 An understanding of the controversy concerning the reach of paragraph 1(b) of the order requires quotation of that subparagraph in full. It prohibits the respondent from
 
 
 24
 "(b) Engaging in, or inducing or encouraging any individual employed by White Construction Company, Chicago Bridge & Iron Co., Poirier & McLane Corporation, or any other person engaged in commerce or an industry affecting commerce, to engage in a strike or a refusal in the course of his employment to perform any services; or threatening, coercing, or restraining White Construction Company, Chicago Bridge & Iron Co., Poirier & McLane Corporation, Burns & Roe, Inc., or any other person, where, in either case, an object thereof is to force or require White Construction Company, or any other person engaged on the Oyster Creek, New Jersey, project, to assign any work to employees who are represented by the Respondent, rather than to employees who are represented by another labor organization, except insofar as any such action is permitted under Section 8(b) (4) (D) of the Act."
 
 
 25
 We read this language as covering any jurisdictional dispute which may arise in connection with the performance of any contract or subcontract on the present nuclear power plant project, so long as the Board has not determined that members of a particular union craft are entitled to the work in question. To enforce this order would mean that, in any such case, the respondent would be guilty of contempt if by any coercive means it should seek a resolution of a jurisdictional dispute in its favor. The vice of this, the respondent argues, is that the union is forced to accept whatever work assignment the employer may make. For, under the scheme of the Act, the Board will not entertain a section 10(k) proceeding to resolve a jurisdictional dispute unless it has reason to believe that a union is engaging in the very kind of activity which under the Board's order would be contempt of court. See Local 478, International Union of Operating Engineers, 1968, 172 N.L.R.B. No. 221.
 
 
 26
 We think the union's argument, whatever validity it might have in some cases, overlooks an important circumstance in this case. The contractors and the labor organizations in the building trades involved in this project have voluntarily agreed to the adjustment and resolution of jurisdictional disputes through resort to and decision by the Joint Board. Just as a contractor took the present dispute to the Joint Board, the respondent is free to take any similar future dispute concerning the assignment of work on the project to the Joint Board. The proposed decree would not in any way interfere with the utilization of that agreed method of settling jurisdictional disputes. Only if any employer should refuse to comply with a Joint Board award might the proposed order's prohibition of coercive action unfairly restrain the respondent. Accordingly, we think appropriate language should be added at the end of the order to except from its prohibition coercive action aimed at enforcement of a Joint Board decision. Cf. Local 26, International Fur Workers, (Winslow Bro. & Smith Co.), 1950, 90 N.L.R.B. 1379. But, with that minor modification, we conclude that paragraph 1(b) of the Board's order does not overstep that broad administrative discretion in fashioning appropriate remedies which we have repeatedly recognized. E. g. N. L. R. B. v. Local 542, International Union of Operating Engineers, 3d Cir. 1964, 329 F.2d 512; N. L. R. B. v. Highway Truck Drivers and Helpers, Local No. 107, 3d Cir. 1962, 300 F.2d 317. In reaching this conclusion we have considered the respondent's persistent disposition to violate the provisions of section 8(b) (4) as demonstrated by the numerous cases in which this court has found it necessary to enforce Board orders against it and at least two cases in which we have found it necessary to invoke our contempt power to obtain the respondent's compliance with our orders.[3]
 
 
 27
 The order of the Board, modified and restricted in accordance with this opinion, will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Whether this contention should fail here because it was not advanced before the Board, we do not decide
 
 
 [2]
 In an effort to avoid this conclusion the respondent has cited cases in which a section 10(k) hearing has been required after some third party has decided that one union rather than the other should be assigned the disputed workE. g., International Union of Operating Engineers, Local 520 (Biebel Bros.), 1968, 170 N.L. R.B. No. 38; Plasterers Local Union 79, 1967, 167 N.L.R.B. No. 23; Albany Printing Pressmen, 1967, 166 N.L.R.B. No. 71; United Industrial Workers, Seafarers (Albin Stevedore Co.), 1967, 162 N.L.R.B. No. 96. But in none of these cases was the decision of the third parties one by which the parties were bound, whether by contractual agreement or otherwise.
 
 
 [3]
 E. g., N.L.R.B. v. Weber, 3d Cir. 1967, 382 F.2d 387; N.L.R.B. v. Local 825, I.U.O.E., 3d Cir. 1964, 326 F.2d 213; N.L.R.B. v. Local 825, I.U.O.E., 3d Cir. 1963, 322 F.2d 478; N.L.R.B. v. Local 825, I.U.O.E., 3d Cir. 1963, 315 F.2d 695
 In addition, this court has found it necessary in one case to adjudge Local 825 in contempt for refusal to comply with our decree enforcing a Board order. N.L. R.B. v. Local 825, No. 14,331 Order of June 18, 1964. A second such proceeding is pending at Nos. 17,091 and 17,092.